| | | |
|---|---|---|
| YVONNE R. RICHARDSON, by her<br>Conservator Barbara Carlin, and the<br>MAINE POOLED DISABILITY TRUST,<br>on its own behalf and on behalf of its<br>current and future participating<br>beneficiaries over age 64, and on behalf<br>of all other similarly situated individuals, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | 2:17-cv-00134-JAW |
| RICKER HAMILTON, in his official<br>Capacity as Commissioner of the<br>MAINE DEPARTMENT OF HEALTH<br>AND HUMAN SERVICES, | )<br>)<br>)<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

## ORDER ON MOTION TO DISMISS

A Medicaid beneficiary and a pooled special needs trust bring this action seeking injunctive and declaratory relief against the Commissioner of the Maine Department of Health and Human Services (MDHHS), alleging improper treatment of deposits into pooled special needs trusts for purposes of benefits eligibility determinations in violation of the Medicaid Act, 42 U.S.C. §§ 1396 *et seq*. The Medicaid beneficiary deposited into the trust the proceeds of the sale of her home, and MDHHS treated this asset transfer as one that did not give the beneficiary equal value. As a result, MDHHS notified the Medicaid beneficiary that it would temporarily suspend certain benefits as a penalty. The beneficiary administratively

appealed MDHHS's determination to a state of Maine Administrative Hearing Officer; her appeal is still pending and has been stayed pending this Court's adjudication of this action. The Commissioner moves to dismiss the Plaintiffs' claims on the ground that the Medicaid Act requires it to treat such asset transfers in the manner that it does.

The Court dismisses the Medicaid beneficiary's claims as unripe. The Court also dismisses Count I because it is not cognizable and Count II because the Medicaid Act provides for the penalty that the MDHHS imposes upon transfers into pooled special needs trusts for the benefit of persons over age sixty-four.

## I. BACKGROUND

### A. Procedural History

On April 13, 2017, Yvonne Richardson and the Maine Pooled Disability Trust (MPDT) filed a complaint pursuant to 42 U.S.C. § 1983 on behalf of themselves and a purported class against Mary Mayhew[1] in her official capacity as Commissioner of the MDHHS. *Compl.* (ECF No. 1). The Complaint contains two counts, each representing a theory of how MDHHS violates the Medicaid Act in its treatment of deposits into the MPDT by individuals over age sixty-four as transfers of assets for less than fair market value. *Id.* at 8-9. Count I, brought by Ms. Richardson and "others similarly situated", alleges that Ms. Richardson and others "receive fair market value from the expenditures the MPDT can make on her behalf pursuant to

---

[1] Since the filing of the Complaint, Ricker Hamilton succeeded Mary Mayhew as Commissioner of the MDHHS. *Def.'s Mot. to Substitute Party* (ECF No. 20). Mr. Hamilton has been substituted as the Defendant in this case. *Order Granting Def.'s Mot. to Substitute Party* (ECF No. 21).

its fiduciary duties to them." *Id.* Count II, apparently brought by MPDT alone, alleges that "no statute imposes a transfer of assets penalty for transfers to an exempt pooled special needs trust such as the MPDT." *Id.* at 9.

On May 12, 2017, the Commissioner filed a motion to dismiss the Complaint pursuant to Rule 12(b)(6). *Def.'s Mot. to Dismiss* (ECF No. 7) (*Def.'s Mot.*). The Plaintiffs responded and requested oral argument on June 2, 2017. *Pls.' Opp'n to Def.'s Mot. to Dismiss and Req. for Oral Arg.* (ECF No. 8) (*Pls.' Opp'n*). On June 5, 2017, the Court granted the motion for oral argument. *Order* (ECF No. 10). The Commissioner replied to the Plaintiffs' response on June 16, 2017. *Def.'s Reply in Supp. of Mot. to Dismiss Compl.* (ECF No. 11) (*Def.'s Reply*).

The Court issued an interim order on the motion to dismiss on December 28, 2017, in which it identified one issue the parties had not sufficiently briefed and other issues the parties had not addressed at all. *Interim Order on Mot. to Dismiss* (ECF No. 14). The Court invited the parties to submit supplemental memoranda on ripeness, standing, and enforceability via § 1983 of the relevant provisions of the Medicaid Act, and it ordered the parties to be prepared to discuss them at oral argument. *Id* at 6-7. On January 25, 2018, the Plaintiffs and Defendant filed supplementary memoranda. *Def.'s Supplemental Mem. in Support of Mot. to Dismiss* (ECF No. 17) (*Def.'s Supp. Mem.*); *Pls.' Resp. to Interim Order* (ECF No. 18) (*Pls.' Supp. Mem.*). The Court heard oral argument on February 9, 2018. *Min. Entry* (ECF No. 19).

### B. Statutory Background

Medicaid is a "cooperative federal-state program that provides federal funding for state medical services to the poor." *Frew v. Hawkins*, 540 U.S. 431, 433 (2004). Maine's Medicaid plan, like all state Medicaid plans, must comply with certain requirements imposed by Congress as a condition of participation in the program. *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1382 (2015). One of these is that it "comply with the provisions of section 1396p." 42 U.S.C. § 1396a(a)(18).[2] In 1988, Congress enacted § 1396p(c) "which requires a period of ineligibility for Medicaid benefits in response to the applicant's transfer of assets for the purpose of obtaining benefits." *Peebler v. Reno*, 965 F. Supp. 28, 29 (D. Ore. 1997). The penalty ineligibility period is "directly proportionate to the value of the assets that were transferred." *Id.*

As a general rule, if an individual sixty-five or older applies for Medicaid for nursing facility, assisted living, or home and community-based waiver services, and has made a transfer of assets for less than fair market value within the prior sixty months, that transfer will disqualify the individual for that Medicaid coverage for a penalty period based on the amount of the transfer. *Compl.* ¶ 2; 42 U.S.C. § 1396p(c)(1)(A).

### C.      The Alleged Facts[3]

---

[2]      Section 1396a(a)(18) provides: "A State plan for medical assistance must comply with the provisions of section 1396p of this title with respect to liens, adjustments and recoveries of medical assistance correctly paid,[] transfers of assets, and treatment of certain trusts[.]"

[3]      In considering a motion to dismiss, a court is required to "accept as true all the factual allegations in the complaint and construe all reasonable inferences in favor of the plaintiff []." *Sanchez v. Pereira-Castillo,* 590 F.3d 31, 41 (1st Cir. 2009) (quoting *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30, 33 (1st Cir. 2001)).

### 1.    The Parties

Yvonne R. Richardson is a resident of St. Joseph's Manor nursing facility in Portland, Maine. *Compl.* ¶ 14. She appears by Barbara Carlin, who was appointed as conservator for Ms. Richardson by the Cumberland County Probate Court. *Id.* ¶ 5. MPDT is a corporation established under the laws of the state of Maine with its principal office and place of business in York County, Maine. *Id.* ¶ 6. It is a pooled special needs trust under 42 U.S.C. § 1396p(d)(4)(C). *Id.* Since its inception in 2002 through 2016, the MPDT has enrolled 171 disabled individuals as participants, including forty-three over the age of sixty-four at the time of their enrollment. *Id.* ¶ 9.

Ricker Hamilton is Commissioner of the MDHHS and as Commissioner is responsible for the administration of the Medicaid program in the state of Maine. *Id.* ¶ 7. He has his principal office in Kennebec County, Maine, and the MDHHS has an office in Cumberland County. *Id.* His actions in this case have been and continue to be taken under color of law. *Id.*

### 2.    Yvonne Richardson's Experience

Yvonne Richardson receives Medicaid benefits to help pay for the cost of her nursing facility care. *Id.* ¶¶ 15, 16. After she sold her home, $38,500 of the proceeds from the sale was deposited into the MPDT in January 2017. *Id.* ¶ 15. As a result, the MDHHS issued a notice threatening to temporarily suspend Medicaid coverage for her care at St. Joseph's Manor effective April 1, 2017 but advising her that MDHHS might reconsider if she provided information that showed: (1) the transfer

was made for a reason other than to obtain MaineCare[4]; (2) she did receive something of equal value in return; (3) the transferred assets have been returned; or (4) the penalty would place her in severe hardship. *Id.*; *id.* Attach. 2 *Notice Terminating Medicaid Coverage* at 1 (*MDHHS Notice*). Ms. Richardson timely requested an administrative "fair hearing" to contest the MDHHS decision. *Compl.* ¶ 16. Pending a decision in that appeal, her Medicaid benefits have been continued. *Id.* ¶ 16. The administrative hearing officer stayed the fair hearing pending this Court's adjudication of this case. *Pls.' Supp. Mem.* at 2; *Def.'s Supp. Mem.* at 2 n.1.

Ms. Richardson desires to make purchases that would increase her quality of life, such as large-print word search and crossword puzzle books, new clothing, sweets, manicures, magazines, and a radio. *Id.* ¶ 19. She cannot currently afford such items, but funds from the MPDT could put them within reach. *Id.* Using funds from her MPDT sub-account, Ms. Richardson is also interested in obtaining the services of a private caregiver who could bring her on outings and get her out of her room where she spends most of her days. *Id.*

### 3. Treatment as Transfers of Assets for Less than Fair Market Value and Penalty Period of Medicaid Ineligibility

The MDHHS treats the funding of pooled special needs trusts by individuals over age sixty-four as a transfer of assets for less than fair market value. *Id.* ¶ 3. As a result of such treatment, MDHHS imposes a penalty period of Medicaid ineligibility on those individuals for nursing facility, assisted living, or home- and community-

---

[4]     MaineCare is the name of Maine's Medicaid Program.

based services pursuant to 42 U.S.C. § 1396p(c).  *Id.*

## II.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  To state a claim, a complaint must contain, among other things, "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Rather, to survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane."  *García-Catalán v. United States*, 734 F.3d 100, 103 (1st Cir. 2013) (citing *Rodríguez–Reyes v. Molina–Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'" *Id.* (quoting *Morales–Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct

alleged.'" *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## III. DISCUSSION

### A. Ripeness of Ms. Richardson's Claims

MDHHS argues that Ms. Richardson has not suffered injury "given the pending administrative action (which could result in reversal of the penalty)", *Def.'s Mot.* at 6, n.6, and that, as a result, her claims are unripe. *Def.'s Supp. Mem.* at 3. Plaintiffs assert "that the class nature of the claim likely overcomes any challenge to ripeness or justiciability," and they argue that judicial economy considerations cut against dismissal on unripeness grounds. *Pls.' Opp'n* at 1, n.1. They further argue that the administrative hearing officer is "precluded from entertaining issues of federal law" in his consideration of Ms. Richardson's appeal and suggest that, as such, the administrative process could not resolve Ms. Richardson's claim. *Pls.' Supp. Mem.* at 2-3. Plaintiffs also argue that the doctrine of exhaustion of administrative remedies does not apply to § 1983 actions pursuant to *Patsy v. Board of Regents of State of Florida*, 457 U.S. 496 (1982).[5] The Court does not consider the issue of exhaustion of administrative remedies because it is not relevant here.

---

[5]      While true, it is not clear why Plaintiffs raise this. The doctrine of exhaustion is separate from the doctrine of ripeness. *See McCarthy v. Madigan*, 503 U.S. 140, 144 (1992) ("The doctrine of exhaustion of administrative remedies is one among related doctrines—including abstention, finality, and ripeness—that govern the timing of federal-court decisionmaking"); *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 192-93 (1985) ("The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable") (internal citations omitted); *Kelly v. Nordberg*, 1 F.3d 1231 (1993) (per curiam) ("In conclusion we decide here only the exhaustion of remedies issue presented to us. We express no opinion on any other question of justiciability, including standing, ripeness, mootness, or the like"); *Teneco Oil Co., Inc. v. Dept. of Consumer Affairs*, 876 F.2d 1013, 1025-29 (1st Cir. 1989); *but cf. Exeter-West Greenwich Reg'l School*

## 1. General Principles

"If standing is a question of who, then ripeness—which shares standing's constitutional and prudential pedigree—is a question of when." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999) (citations omitted). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–581 (1985)). The United States Supreme Court has explained that, with respect to administrative decisions, the ripeness doctrine seeks "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967) *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). "While the doctrine has a prudential flavor, a test for ripeness is also mandated by the constitutional requirement that federal jurisdiction extends only to actual cases or controversies." *Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d

---

*Dist. v. Pontarelli*, 788 F.2d 47, 54 (1st Cir. 1986) ("Defendant's ripeness argument fails because the exhaustion of administrative remedies is not required before a § 1983 suit may be filed"). "While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. *Patsy* concerned the latter, not the former." *Williamson Cty.*, 473 U.S. at 193. The plaintiff in *Patsy*, just like plaintiffs in most exhaustion of remedies cases, sought review of an adverse decision. Ms. Richardson is in different situation, as the Court elaborates in its ripeness discussion. *See infra* subsection (III)(A)(2).

530, 535 (1st Cir. 1995) (citing U.S. CONST. art. III, § 2; *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 242–45 (1952)).

"To determine whether a case is ripe for review, a federal court must evaluate the fitness of the issue presented and the hardship that withholding immediate judicial consideration will work." *Whitehouse*, 199 F.3d at 33 (citing *Abbott Labs.*, 387 U.S. at 149). The First Circuit observes that fitness and hardship "are related but distinct." *Id.* (citing *Ernst & Young*, 45 F.3d at 535). Fitness "typically involves subsidiary queries concerning finality, definiteness, and the extent to which resolution of the challenge depends upon facts that may not yet be sufficiently developed." *Ernst & Young*, 45 F.3d at 535 (citing *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992)). Hardship "typically turns on whether the challenged action creates a direct and immediate dilemma for the parties." *Id.* (quoting *W.R. Grace*, 959 F.2d at 360). "Perhaps the most important consideration in determining whether a claim is ripe for adjudication is the extent to which the claim involves uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all." *W.R. Grace*, 959 F.2d at 364-65 (quoting *Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 847 (1st Cir. 1990)).

## 2.  Fitness for Judicial Decision

Finality, definiteness, and the need for further factual development are the factors courts examine in determining whether a controversy meets the fitness prong of the ripeness inquiry. "[I]f a claim challenging final agency action is not concrete, it may be unfit for judicial review without regard to whether the complaining party

has standing to pursue the claim." *Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012). If the agency action is not final, a claim may be unripe. *Id.*; *Kushi v. Romberger*, 543 Fed. App'x 197, 200-01 (3d Cir. 2013).

Any penalty (and related adverse impact on Ms. Richardson's benefits) has been stayed pending her administrative appeal. *Compl.* ¶ 16. As MDHHS points out, that appeal could result in reversal of the penalty. *Def.'s Mot.* at 6, n.6. In its notice to Ms. Richardson, MDHHS specifies four showings she may make to convince MDHHS not to impose the threatened penalty: (1) information to prove that the transfer was made for a reason other than to get MaineCare; (2) information to prove that she got something of equal value in return from MPDT; (3) information to prove that the asset or a part of it was returned to her; and (4) information to prove that the penalty would impose a hardship, defined as her health or life being threatened or as her being deprived of food, clothing, shelter or other needs of life. *Compl.* Attach. 1 (*Notice from DHHS, Office for Family Independence* at 1 (Feb. 28, 2017). Ms. Richardson's argument about the inability of the administrative hearing officer to consider questions of federal law—even if its premise is correct—is unpersuasive. The hearing could result in a decision favorable to Ms. Richardson on a number of grounds not involving interpretation of federal law, and the Court declines to speculate as to administrative hearing officer's decision and/or its rationale.

Therefore, Ms. Richardson's claims lack sufficient finality and definiteness. This is true despite the fact that a key issue in this case is the contours of MDHHS' obligations under the Medicaid Act. Her harm is contingent and may never

materialize if in fact the penalty period threatened by MDHHS never commences and her benefits remain unchanged. *See W.R. Grace*, 959 F.2d at 364-65 (internal quotation omitted) (this claim "depends entirely upon uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all"). As Ms. Richardson has not yet and may never feel the effects of MDHHS' decision "in a concrete way", *see Abbott Labs.*, 387 U.S. at 148–49, the Court concludes that her challenge to MDHHS' action is not currently fit for judicial review.

### 3. Hardship to Ms. Richardson

Hardship, the First Circuit has written, "turns on 'whether granting relief would serve a useful purpose, or, put another way, whether the sought-after declaration would be of practical assistance in setting the underlying controversy to rest.'" *Barnstable*, 786 F.3d at 143 (quoting *Verizon New England, Inc. v. Int'l Bhd. of Elec. Workers, Local No. 2322*, 651 F.3d 176, 188 (1st Cir. 2011)). The hardship prong requires a "direct and immediate dilemma." *Ernst & Young*, 45 F.3d at 535 (quoting *W.R. Grace*, 959 F.2d at 365).

As the Court has previously discussed, MDHHS has stayed any penalty (and related adverse impact on Ms. Richardson's benefits) pending her administrative appeal. *Compl.* ¶ 16. As MDHHS points out, that appeal could result in reversal of the penalty. *Def.'s Mot.* at 6, n.6. Thus, it is unclear whether a decision by this Court would necessarily resolve the underlying controversy between Ms. Richardson and MDHHS. Furthermore, Ms. Richardson and MPDT bring identical claims. Hence, the Court's resolution of the MPDT claims may likely be instructive to Ms.

Richardson's situation even if her pending administrative appeal makes her claims in this Court currently unripe.

The parties agreed at oral argument that dismissal of Ms. Richardson's claim would not present statute of limitations issues. Generally, "[a] time limitation on petitions for review . . . can run only against challenges ripe for review." *City of Fall River, Mass. v. F.E.R.C.*, 507 F.3d 1, 7 (1st Cir. 2007) (quoting *Baltimore Gas & Elec. Co. v. Interstate Commerce Comm'n*, 672 F.2d 146, 149 (D.C. Cir. 1982)). MDHHS represented that the statute of limitations would run from the time of the imposition of any penalty on Ms. Richardson. Hence, Ms. Richardson could reinstate a lawsuit such as this one after the imposition of any penalty without running afoul of the statute of limitations.

Ms. Richardson has not argued hardship. Because the Court concludes that Ms. Richardson's claims are unfit for judicial review and that an inability to obtain judicial review would not cause her hardship, the Court concludes that Ms. Richardson's individual claims against MDHHS are not ripe for adjudication. The Court dismisses her claims without prejudice.

## B.  MPDT's Standing

At oral argument, the parties agreed that MPDT has standing in its own right to bring its claims. The injury MPDT sustained involves a decrease in new enrollees and funds coming into the Trust. *Pls.' Supp. Mem.* at 4-6. In addition, MPDT may have associational standing to bring suit on behalf of its members. *See Hunt v. Wash.*

*State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The parties also agreed at oral argument that MPDT has associational standing.

As Justice Souter recently explained while sitting by designation on the First Circuit, for a group "to assert associational standing on behalf of its members [] requires, among other things, that at least one of the group's members have standing as an individual." *Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (citing *Town of Norwood v. F.E.R.C.*, 202 F.3d 392, 405–06 (1st Cir. 2000)). "To satisfy this requirement, the association must, at the very least, 'identify [a] member[ ] who ha[s] suffered the requisite harm.'" *Id.* (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)). MPDT brings this suit "on its own behalf and on behalf of its current and future participating beneficiaries over age [sixty-four], and on behalf of all other similarly situated individuals." *Compl.* at 1. While MPDT states that "since its inception in 2002 and through 2016 [it] has enrolled 171 disabled individuals as participants, including forty-three (43) who were over age 64 at the time of their enrollment," *Compl.* ¶ 9, the only participating beneficiary that MPDT identifies specifically in its Complaint is Ms. Richardson.[6] Hence, if Ms. Richardson lacks standing to sue, MPDT also lacks standing.

### 1. Associational Standing: Yvonne Richardson's Standing

For Ms. Richardson to have standing, she must show (1) that she is suffering or is threatened with an injury-in-fact; (2) that there is a causal connection between

---

[6]     MPDT identified another individual by name at oral argument, however the Court lacks sufficient facts regarding that individual to determine whether he would have standing, and, in any case, it does not affect the Court's ultimate analysis.

the MDHHS action of which she complains and her threatened injury; and (3) that action by the Court favorable to her would likely redress her threatened injury. *See Norwood*, 202 F.3d at 406 (citing *Bennett*, 520 U.S. at 162). That Ms. Richardon's claims are unripe does not resolve the standing question. *See R.I. Ass'n of Realtors, Inc.*, 199 F.3d at 33 (1st Cir.1999) (citations omitted) ("If standing is a question of who, then ripeness—which shares standing's constitutional and prudential pedigree—is a question of when"). "Ripeness [] easily could be seen as [one of] the time dimensions of standing. [Ripeness] assumes that an asserted injury would be adequate; ripeness then asks whether an injury that has not yet happened is sufficiently likely to happen . . . ." *McInnins-Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 69 (1st Cir. 2003) (citing ERWIN CHEMERINSKY, FEDERAL JURISDICTION § 2.4.1, at 114 (3d ed.1999)); *see Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012) (dismissing an appeal as unripe where the plaintiff-appellants "obviously had standing;" and stating "if a claim challenging final agency action is not concrete, it may be unfit for judicial review without regard to whether the complaining party has standing to pursue the claim"). Thus, while ripeness asks whether now is an appropriate time for the court to consider the lawsuit, standing asks whether the plaintiff is an appropriate person to bring the lawsuit. *See id.* at 70.

### a.    Injury-in-Fact

An injury in fact is defined as "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal

citations and quotations omitted). In a suit challenging a hospital's after-birth recovery area's accommodations for disabled persons brought by a disabled woman who hoped to become pregnant, the First Circuit opined that to call the plaintiff's "possible injuries 'hypothetical' is, in a sense, inaccurate; it is clear already what the nature of the claim is, the contours of the threatened injury, that the injury would be traced to challenged action, and that the injury is redressable by a court." *McInnis-Misenor*, 319 F.3d at 71. The contours of the threatened injury are similarly clear here.

### i. Concrete & Particularized

For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way."[7] *Spokeo*, 136 S. Ct. at 1548. For a threatened injury to be concrete, it must be real and not abstract. *Id.* MDHHS threatens not to pay Ms. Richardson's nursing care expenses for a three-month penalty period. *MDHHS Notice* at 1. The threat is directed at Ms. Richardson individually and the associated injury is real. If the penalty period were to take effect, Ms. Richardson would experience a new financial liability to pay for her nursing home care. Thus, the threatened injury is both concrete and particularized to Ms. Richardson.

### ii. Actual or Imminent, not Conjectural or Hypothetical

---

[7] "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance. The victims' injuries from a mass tort, for example, are widely shared, to be sure, but each individual suffers a particularized harm." *Spokeo*, 136 S. Ct. at 1548 n.7. That others may have been injured by MDHHS' treatment of transfers of assets into pooled special needs trusts does not mean that Ms. Richardson's threatened injury is not particularized to her.

"Imminence, which plays a central role in cases of probabilistic standing, 'is concededly a somewhat elastic concept.'" *Kerin v. Titeflex Corp.*, 770 F.3d 978, 981 (1st Cir. 2014) (quoting *Clapper*, 133 S. Ct. at 1147) (further internal quotation omitted)). A "'substantial risk' that [a] harm will occur" may satisfy the requirement that a plaintiff's threatened injury be actual or imminent, not conjectural or hypothetical. *See Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). The Supreme Court instructed that, at least in the context of criminal penalties, a plaintiff need not experience enforcement of a law they seek to challenge to satisfy the injury-in-fact requirement. *Driehaus*, 134 S. Ct. at 2342; *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 297-99 (1979). Courts have applied this principle in the civil context as well. *See, e.g., Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) ("Moreover, the threat need not stem from a criminal action: [a]dministrative action, like arrest or prosecution, may give rise to harm sufficient to justify pre-enforcement review" (internal quotation omitted)); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 517-29 (N.D. Cal. 2017) (threat of withholding federal grant money leads to injury-in-fact supporting standing in the form of budgetary uncertainty); *Niang v. Carroll*, No. 4:14-cv-1100-JMB, 2016 WL 5076170, *9 (E.D. Mo. Sept. 20, 2016) ("It is uncontested that the [challenged statute] carries the risk of criminal and civil penalties. Although no *criminal* prosecutions appear to have been brought, Defendants have regularly engaged in civil enforcement proceedings, stripping establishments of their licenses due to the presence of unlicensed practitioners on

their premises, and Plaintiffs have either an ownership interest in, or are employed by similar establishments") (emphasis in original).

MDHHS has unambiguously threatened Ms. Richardson with a three-month suspension of her nursing care benefits. *See MDHHS Notice* at 1. The notice it sent her describes, a "decision" that "MaineCare will not pay your nursing care expenses," that "MaineCare will close effective April 1, 2017 for the people listed below," and that "MaineCare will no longer pay the cost of room and board for" Ms. Richardson. *Id.* at 1, 2, 5. This is far from conjecture.

This language stands in contrast to *Sexton v. Medicare*, 194 F. Supp. 3d 209 (E.D.N.Y. 2016). In *Sexton*, the Centers for Medicare and Medicaid Services sent a letter to the plaintiff which stated explicitly that it "IS NOT A BILL" and that plaintiff should "NOT SEND PAYMENT AT THIS TIME." *Id.* at 214 (emphasis in original). The *Sexton* letter merely explained that plaintiff "may be required to reimburse Medicare for medical expenses related to [his] . . . liability claim." The *Sexton* Court found it was conjectural whether Medicare improperly sought to recover purported overpayments directly from him. *Id.* Whereas in *Sexton* no final decision had been made and the plaintiff had to await one, here MDHHS made a decision adverse to Ms. Richardson, prompting its notice. Had she not timely requested an administrative hearing, there is no reason to conclude that the penalty in the notice would not have been imposed. Thus, the language and threatened injury facing Ms. Richardson is imminent.

While her pending administrative appeal may resolve favorably to her, leading to no penalty period ever being imposed, it might turn out the other way. The Court finds that these circumstances are sufficient to constitute a substantial risk that a harm will occur for purposes of the standing inquiry. The chance of the threatened penalty period being imposed—while insufficient to render Ms. Richardson's claims ripe—is enough to satisfy the requirement that an injury be neither hypothetical nor conjectural for standing purposes.

### b.      Causation & Redressability

The causal link between MDHHS' action and the harm Ms. Richardson complains of is direct. Indeed her claims are entirely founded upon MDHHS treatment of her assets. MDHHS does not dispute this, and it represents that "[t]his lawsuit presents solely legal issues." *Def.'s Mot.* at 1.

This also points to the answer on the redressability inquiry. If the Court agreed with Ms. Richardson that MDHHS' treatment of transfers of assets into pooled special needs trusts violated the Medicaid Act and if the Court ordered declaratory and injunctive relief, Ms. Richardson's grievances would be redressed.

Having found that Ms. Richardson has pleaded an injury in fact caused by the MDHHS' action and that the Court could likely redress in this litigation, Ms. Richardson has standing to bring the underlying claims. Given that she is a participating beneficiary of the MPDT, her standing is sufficient to satisfy the requirement for associational standing for MPDT that at least one Trust member

have standing to bring the claims. The Court turns to the other two necessary showings MPDT must make for associational standing.

## 2. The Interests at Stake are Germane to MPDT's Purpose

Given that Ms. Richardson has standing to sue, the MPDT must meet two other thresholds. First, the interests served by the suit must be pertinent to MPDT's mission, and, second, relief must not require the presence of other MPDT enrollees in the lawsuit. *Norwood*, 202 F.3d at 405-06 (internal citation omitted); *Animal Welfare Institute v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010); *Laidlaw*, 528 U.S. at 181. In *Lewis v. Alexander*, 685 F.3d 325 (3rd Cir. 2012), the Third Circuit explained that "[i]n enacting the trust provisions of the [Omnibus Budget Reconciliation Act of 1993], Congress provided a comprehensive system for dealing with the relationship between trusts and Medicaid eligibility. . . Its primary objective was unquestionably to prevent Medicaid recipients from receiving taxpayer-funded health care while they sheltered their own assets for their benefit and the benefit of heirs. But a secondary objective was to shield special needs trusts from impacting Medicaid eligibility." *Id.* at 343.

The MPDT trust agreements speak to its purpose, which includes "not to displace assistance which may be otherwise available to" its beneficiaries and securing services and benefits that are "in addition to and over and above the benefits they already receive, are entitled to receive, or may receive or be entitled to receive in the future."[8] *Compl.* Attach. 3 *MPDT Trust Agreements*, at 2-3. The crux of this

---

[8]     The purpose section of the MPDT trust agreement reads:

        It is the intention of the Wardwell to establish a supplemental fund pursuant to 42 U.S.C. §[]1396p[](d)(4)(C) as amended from time to time and applicable state

case is whether MPDT's beneficiaries' deposits into the Trust should affect their eligibility for Medicaid benefits. In Ms. Richardson's case, MDHHS threatened a penalty period during which she would be ineligible to receive nursing home care benefits, as a direct result of her transfer of assets into the MPDT. Hence, the interests at stake directly implicate at least a portion of MPDT's purpose—ensuring that its beneficiaries remain eligible for means-tested public benefits.

### 3. Relief Does Not Require the Presence of other Members

"Member participation is not required where a 'suit raises a pure question of law' and neither the claims pursued nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization." *Center for Sustainable Economy v. Jewell*, 779 F.3d 588, 597 (D.C. Cir. 2015) (citing *Int'l*

---

rules, for the benefit of Beneficiaries under this Trust, and not to displace assistance which may be otherwise available to those Beneficiaries. It is important that all Beneficiaries under this Trust maintain a level of human dignity and humane care. If this Trust were to be invaded by creditors, subject to any liens or encumbrances, or cause government assistance to not be initiated or to be terminated, it is likely that the Trust corpus would be depleted prior to the Beneficiaries' deaths, especially if the cost of care for those beneficiaries would be high. In such event, there would not be coverage for emergencies or supplementation of basic needs.

The express purpose of this Trust is to provide for the collective management and distribution of the Trust Estate on behalf of eligible beneficiaries (hereinafter called "Designated Beneficiaries") who are disabled as defined at 42 U.S.C. § 1382c(a)(3) (or any successor statute) for whom trust accounts (hereinafter called "trust accounts") are established.

The Designated Beneficiaries are the primary object of this Trust, with the interest of persons (individuals or not-for-profit corporations) succeeding to the Trust Estate upon the death of the Designated Beneficiaries (such persons being hereinafter called "Remainder Beneficiaries") being subordinate. This Trust is intended to provide, in the sole and absolute discretion of the Trustees, extra and supplemental services and benefits for the care, support, comfort, education, and training of the Designated Beneficiaries in addition to and over and above the benefits they already receive, are entitled to receive, or may receive or be entitled to receive in the future as a result of their present or future mental retardation or physical, psychological, or developmental disability from any federal, state, or local government program, agency, or department.

*Compl.* Attach. 3 *MPDT Trust Agreements*, at 2-3.

21

*Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 288 (1986)).

Here, the claims revolve purely around a question of law—whether MDHHS, by its undisputed actions, is violating the Medicaid Act. The MPDT beneficiaries' individual circumstances would not affect the Court's analysis. Unlike a claim for damages, which would require individualized proof, *see Warth*, 422 U.S. at 515-16, the relief MPDT seeks is declaratory and injunctive in nature. *See id.* at 515 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005).

Having found that: (1) one of MPDT's members, Ms. Richardson, has standing to bring its claims; (2) the interests at stake in this case are germane to MPDT's purpose; and (3) the relief requested does not require the participation of other MPDT beneficiaries in this litigation, the Court finds that MPDT has associational standing to bring its claims on behalf of its beneficiaries.[9]

### C. Cognizability of § 1983 Action to Enforce 42 U.S.C. §§ 1396a(a)(18), 1396p, and 1396p(d)

Before addressing the merits, the Court must first examine whether MPDT may seek to enforce any rights secured for its benefit in the Medicaid Act provisions

---

[9] At oral argument, the parties agreed that the Court should proceed with the motion to dismiss as to Ms. Richardson and MPDT, rather than first addressing class certification. *See Sanchez v. Triple S Mgmt., Corp.*, 492 F.3d 1 (1st Cir. 2007); *Good v. Altria, Inc.*, 231 F.R.D. 446, 447 (Me. D. 2005).

it alleges the MDHHS violated—42 U.S.C. §§ 1396a(a)(18), 1396p(c)(1)(A)[10], and 1396p(d)—via an action brought pursuant to 42 U.S.C. § 1983.[11]  This is because § 1983 provides an enforcement mechanism and remedy only for the deprivation of rights, "not [] broader or vaguer 'benefits' or 'interests'" secured by federal laws. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action."  *Douglas v. Independent Living Center of S. Cal., Inc.*, 565 U.S. 606, 619 (2012) (Roberts, C.J., dissenting) (quoting *Gonzaga Univ.*, 536 U.S. at 286).

To determine whether a particular right is enforceable under § 1983, a court must determine (1) whether the provision clearly creates a right that redounds to the benefit of the plaintiff; (2) whether the right the provision supposedly confers is not too "vague and amorphous" to be enforceable; and (3) whether the provision creates a binding obligation on the state.  *DeCambre v. Brookline Housing Auth.*, 826 F.3d 1, 10 (1st Cir. 2016) (quoting *Colón–Marrero v. Vélez*, 813 F.3d 1, 17 (1st Cir. 2016)). Affirmative answers to these three questions mean that the provision is presumptively enforceable under § 1983; however, a defendant still may show that Congress nonetheless intended to bar § 1983 relief for a violation of the right at

---

[10]     Count I of the Complaint seems to allege a violation of 1396p as a whole.  MPDT clarified that it alleges violation of § 1396p(c)(1)(A) in particular.  *Pls.' Supp. Mem.* at 7.

[11]     Section 1983 provides in part:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983.

issue.[12]  *Id.* (quoting *Colón–Marrero* at 20).  Hence, even if MPDT is correct that MDHHS is violating its obligations under a particular provision of the Medicaid Act, that does not mean that MPDT has a right of action to challenge that violation.  For MPDT to sustain this action, at least one of the sections of the Medicaid statute that forms the basis of MPDT's claims must contain rights-creating language inuring to the benefit of MPDT.

The second and third parts of the test are easily satisfied here.  The right the Medicaid Act supposedly confers here—not to have the state treat deposits into special needs trusts as transfers of assets for less than fair market value and not to suffer a penalty for such deposits—is specific, clear, and enforceable.

All the provisions of the Medicaid Act that MPDT cites discuss the state's binding obligations in administering its Medicaid plan and are written in mandatory, not precatory language.  For example, § 1396a(a)(18) says that "a State plan for medical assistance *must* comply with the provisions of section 1396p . . . ."  42 U.S.C. § 1396a(a)(18) (emphasis supplied).  Subsection (d) mandates the way states must treat trust amounts, and paragraph (d)(4) states "[t]his subsection *shall not* apply to any of the following trusts . . . ."  42 U.S.C. § 1396p(d)(4) (emphasis supplied).[13]

---

[12]  Because MDHHS does not contest the cognizability of the Plaintiffs' § 1983 claims, *Def.'s Supp. Mem.* at 9-12, and the Court raised the issue sua sponte, the Court does not address whether Congress intended to prohibit relief.

[13]  The Tenth Circuit held to the contrary.  *Hobbs ex rel. Hobbs v. Zenderman*, 579 F.3d 1171, 1179-80 (10th Cir. 2009) (holding that § 1396p(d)(4)(A) "cannot support a § 1983 claim because it does not "unambiguously impose a binding obligation on the State", thus failing the third part of the three-part test).  It did so because it felt compelled to follow one of its precedents in which it had held "that States need not count § 1396p(d)(4) trusts for eligibility purposes, but nevertheless may . . . opt to do so."  *Id.* at 1180 (citing *Keith v. Rizzuto*, 212 F.3d 1190, 1193 (10th Cir. 2000)).  As the Tenth Circuit wrote "[a]lthough the statute might have been read in the first instance to require States to exempt special needs trusts, that construction is foreclosed by our opinion in *Keith*."  *Id.* at 1180.

Section 1396p(c)(1)(A) states that "the State plan *must* provide that if an institutionalized individual or the spouse of such an individual . . . disposes of assets for less than fair market value" the beneficiary shall be subject to a penalty. 42 U.S.C. § 1396p(c)(1)(A) (emphasis supplied).

The Court turns to the less clear-cut part of the inquiry: whether the Medicaid Act provisions cited by MPDT are clearly intended to create a right for MPDT.

### 1. Rights-Creating Language Directed to a Discrete Class of Beneficiaries

The key test that courts apply in determining whether a section of a statute creates a privately enforceable right is whether such section contains "rights-creating language." *Armstrong*, 135 S. Ct. at 1387-88 (§ 1396a(30)(A) does not contain rights-creating language); *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56, 72-75 (1st Cir. 2005) (sustaining § 1983 action by federally qualified health centers to enforce 42 U.S.C. § 1396a(bb)); *Long Term Care Pharmacy All. v. Ferguson*, 362 F.3d 50, 56-57 (1st Cir. 2004) (finding 42 U.S.C. § 1396a(a)(30)(A) not enforceable via § 1983 action, and suggesting § 1396a(a)(13)(A) is enforceable via § 1983 action).

Where they do find rights-creating language, courts also determine whom Congress intended to benefit. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 (1979) ("the threshold question . . . is whether the statute was enacted for the benefit of a special class of which plaintiff is a member"); *see, e.g., Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo*, 551 F.3d 10, 17 (1st Cir. 2008) (quoting *Rullan*, 397 F.3d

---

There is no similar precedent from the First Circuit that would require the Court to read § 1396p(d) as permissive.

at 74) ("The precise federal statutory language that forms the basis of plaintiffs' claims regarding methodology . . . is 'rights-creating language because it is mandatory and has a clear focus on the benefitted FQHCs, rather than the regulated states'"); *see, e.g., Am. Soc. of Consultant Pharmacists v. Concannon*, 214 F. Supp. 2d 23, 28-29 (D. Me. 2002) (§ 1396a(a)(13)(A) creates rights in "providers and beneficiaries of nursing facilities services, hospital services, and services of intermediate care facilities for the mentally retarded, and persons with interests akin to those of the providers and beneficiaries" (internal quotation marks omitted)).

Statutory language that "focuses [] upon the state as 'the person regulated rather than [the] individuals protected'" can indicate a lack of intent to create a right. *Ferguson*, 362 F.3d at 58 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001)). However, "the fact that a statutory command is directed at state officials as part of a broader plan for implementation does not preclude it from likewise creating privately enforceable rights. Language that directs state officials in the implementation of statutory objectives may still create an enforceable right where it 'mentions a specific, discrete beneficiary group within the statutory text' and 'speaks in individualistic terms, rather than at the aggregate level of institutional policy or practice.'" *Colón–Marrero*, 813 F.3d at 17-18.

In *Rolland v. Romney*, 318 F.3d 42 (1st Cir. 2003), the First Circuit found that the Nursing Home Reform Amendments to the Medicaid Act contain "prevalent" rights-creating language. *Id.* at 52-53. Specifically, the *Rolland* Court pointed to the statute's focus on nursing home residents and their rights. *Id.* at 53. These rights

included the right to choose their personal attending physicians, to be fully informed about and participate in care and treatment, to be free from physical or mental abuse, to voice grievances, and to enjoy privacy and confidentiality. *Id.* at 53 n.10 (citing 42 U.S.C. § 1396r(c)(1)(A)). Other portions of the statutory language focus on promoting quality of life of residents and maintaining the highest practicable physical, mental and psychosocial well-being for them. *Id.* (citing § 1396r(b)(1),(2) & (3)). The First Circuit contrasted this type of language with "[s]tatutory language that protects the general public, such as that customarily found in criminal statutes, or that is simply a ban on discriminatory conduct by recipients of federal funds, [which] is far less likely to imply a private remedy than rights-creating language." *Id.* at 53.

### a. § 1396a(a)(18)—Liens, Adjustments and Recoveries

Section 1396a(a)(18) requires state Medicaid plans to "comply with the provisions of section 1396p of this title with respect to liens, adjustments and recoveries of medical assistance correctly paid,[] transfers of assets, and treatment of certain trusts." 42 U.S.C. § 1396a(a)(18). This language does not speak of individuals or rights. Instead it is targeted at the states and speaks only to their obligations under another section of the statute. This section lacks rights-creating language, and, thus, does not support a private right of action under § 1983.

In *Lewis v. Alexander*, 685 F.3d 325, 344-45 (3rd Cir. 2012), the Third Circuit found that this section conferred a right on two plaintiffs—both charitable organizations managing pooled trust accounts and meeting the requirements of § 1396p(d)(4)(C). *Id.* at 336, 344-45. In doing so, the *Lewis* Court analogized the

provision to § 1396a(a)(8), which the Third Circuit had previously found to confer an individual right supportive of a § 1983 action. *Id.* at 345. It did not provide any other rationale. This Court respectfully disagrees with the analogy and conclusion.

Section 1396a(a)(8) requires that a state Medicaid plan "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). This language speaks directly to the individuals benefitted, even as it directs that the state comply.

By contrast, § 1396a(a)(18) directs state compliance—without reference to any discrete group of benefitted individuals. It essentially serves as a cross-reference, directing compliance with another part of the Medicaid Act. All the language after the term "section 1396p" simply describes the subject matter of § 1396p—no more. Absent a reference to benefitted individuals, and absent any substance beyond requiring compliance with another part of the statute, the Court does not view § 1396a(a)(18) as containing rights-creating language. Thus, the Court finds that § 1396a(a)(18) is unenforceable via § 1983. This conclusion does not make a material difference in this case because, while MPDT alleges violations of this provision in each of its two counts, it also alleges, in each count, violations of other provisions.

**b.      § 1396p(c)(1)(A)—Taking Into Account Certain Transfers of Assets**

The other statutory provision MDPT alleges MDHHS violated in Count I of the complaint is § 1396p. In its response to the Court's interim order, MDPT clarified

that it alleges violation of § 1396p(c)(1)(A) specifically.  *Pls.' Supp. Mem.* at 7.

Subsection (c) is entitled "taking into account certain transfers of assets", and

subparagraph (1)(A) states:

> In order to meet the requirements of this subsection for purposes of
> section 1396a(a)(18) of this title, the State plan must provide that if an
> institutionalized individual or the spouse of such an individual (or, at
> the option of a State, a noninstitutionalized individual or the spouse of
> such an individual) disposes of assets for less than fair market value on
> or after the look-back date specified in subparagraph (B)(i), the
> individual is ineligible for medical assistance for services described in
> subparagraph (C)(i) (or, in the case of a noninstitutionalized individual,
> for the services described in subparagraph (C)(ii)) during the period
> beginning on the date specified in subparagraph (D) and equal to the
> number of months specified in subparagraph (E).

42 U.S.C. § 1396(c)(1)(A).  Courts have found that this provision does not include

rights-creating language and/or does not include rights-creating language benefitting

the plaintiff, and cannot be enforced via § 1983.  *See Lemmons v. Lake*, No. CIV–12–

1075–C, 2013 WL 1187840, at *3, *3 n.2 (W.D. Okla. Mar. 21, 2013) *later vacated as

moot Lemmons v. Lake*, No. CIV–12–1075–C, 2013 WL 6913757 (W.D. Okla. Jun. 28,

2013) ("Plaintiff's claim under § 1396p(c)(1) likewise fails because neither §

1396p(c)(1)(A) nor § 1396p(c)(1)(I) includes the 'rights-creating' language indicating

congressional intent to invoke an individual entitlement for a certain benefitted class

. . . For example, § 1396p(c)(1)(A)'s only mention of 'individuals' relates to the state's

obligation"); *Bernard v. Kansas Health Policy Auth.*, No. 09–1247–JTM, 2011 WL

768145, at *8-9 (D. Kan. Feb. 28, 2011) ("Congress did not intend for it to benefit the

plaintiff.  Rather than conferring a benefit on the plaintiff, the statute imposes a

binding obligation on the state to impose a plan which makes an individual ineligible

for medical assistance if the person or person's spouse disposes of assets for less than fair market value.  []  The statute speaks in terms of 'individuals' but only in relation to imposing an obligation on the states.  The statute itself grants no rights to a plaintiff").  The Court agrees.

The Court doubts that the provision contains rights-creating language.  It also is skeptical as to whether MPDT and its enrollees are the intended beneficiaries.  This is a penalty provision, which makes it easier to identify those it is intended to target but makes it hard to identify beneficiaries.  In the sense that the provision supports the solvency of the Medicaid program generally, the taxpaying public and Medicaid enrollees as a whole are the beneficiaries because the provision is designed to prevent individuals from shifting assets to qualify for benefits when they otherwise would not have done so.  Because the Court is dubious about (1) whether § 1396p(c)(1)(A) contains rights-creating language at all, and (2) whether to the extent the provision has any intended beneficiaries, MPDT is among them, the Court concludes that MPDT likely cannot seek to enforce §1396(c)(1)(A) via § 1983.

However, even if § 1396p(c)(1)(A) contains rights-creating language, and even if MPDT is among the intended beneficiaries of such language, the Court will allow the state process, currently before the administrative hearing officer, to come to a conclusion.  Because the Court finds § 1396a(a)(18) unenforceable through a § 1983 action, because it is dubious about the enforceability of § 1396p(c)(1)(A) via § 1983, and because the state process should play out first, the Court dismisses Count I, which is premised on alleged violations of those two provisions.  Accordingly, the

Court does not reach MPDT's theory in Count I—that beneficiaries receive fair market value from the expenditures the Trust can make on their behalf.

### c.  § 1396p(d) – Treatment of Trust Amounts

Count II of the Complaint alleges violation of Section 1396p(d).  *Compl.* ¶ 21. That provision is titled "treatment of trust accounts," and it begins with the preface "[f]or purposes of determining an individual's eligibility for, or amount of, benefits under a State plan . . . ."  42 U.S.C. § 1396p(d).  The provision's focus is on the individual and references to the individual's eligibility continue throughout the text. The statute's language repeatedly homes in on "the individual," how and for what purposes a trust was established, and "the individual's eligibility."  The provisions explain how and under what circumstances the corpus of a trust and/or payments from a trust shall be considered income to the individual.  Such treatment—as it would under any means-tested eligibility determination—could only render a person less likely—not more likely—to be determined eligible for benefits.  Section 1396p(d)(4) stipulates that the rules laid out in previous parts of the subsection "shall not apply to" certain type of trusts—among them special needs trusts such as MPDT. Thus § 1396p(d)(4) benefits the beneficiaries of special needs trusts in that it excludes them from rules laying out circumstances in which the corpus of and/or payments from a trust might lead them to be determined to have more assets, and thus less likely to be eligible for Medicaid.[14]  This part of the text is "phrased in terms of the

---

[14]     Other courts have come to the same conclusion.  *See, e.g., Wong v. Daines*, F. Supp. 2d. 475, 479 n.2 (S.D.N.Y. 2008) (stating that plaintiff "a disabled person under age 65, [was] the intended beneficiary of the § 1396p(d)(4)(A) exception"); *Lewis v. Rendell*, 501 F. Supp. 2d 671, 687-88 (E.D. Pa. 2007) (finding that plaintiffs are intended beneficiaries of § 1396p(d)(4)(A) and thus have a right to

persons benefitted" *Gonzaga Univ.*, 536 U.S. at 284 (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 692 n.13 (1979)), and is similar to language that the Supreme Court has found to be rights-creating. *See Lewis v. Alexander*, 685 F.3d 325, 345 (3rd Cir. 2012) (finding a private right of action under § 1396p(d)(4)(C) and citing *Gonzaga*, 536 U.S. at 284, 287 (analyzing language from Title VI and Title IX ("No person . . . shall . . . be subjected to discrimination")); *see also Lewis v. Rendell*, 501 F. Supp. 2d 671, 687-88 (E.D. Pa. 2007) (finding § 1396p(d)(4)(A) enforceable via § 1983).

The Eighth Circuit concluded that this provision is intended to benefit a nonprofit corporation which served as a special needs trust trustee, as well as its beneficiaries. *Ctr. for Special Needs Trust Admin., Inc. v. Olson*, 676 F.3d 688, 698-700 (8th Cir. 2012) (finding a private right of action under § 1396p(d)(4)(C)). The *Olson* Court started with the premise that 1396p(d)(4)(C) specifies how a state treats an individual's trust assets for deciding Medicaid eligibility. *Id.* at 699. It went on to reason that plaintiff, "as a non-profit pooled trustee, would benefit from the trusts authorized by paragraph 1396p(d)(4)(C), and thus is an intended beneficiary of the law. Because paragraph 1396p(d)(4)(C) addresses the [plaintiff]'s business—and does not solely tell the state how to act—it was intended to benefit pooled trusts, as well as individuals." *Id.* The Court agrees that the provision creates rights intended to benefit such trusts and their beneficiaries. Thus, the Court finds that MPDT can sustain its § 1983 action to challenge MDHHS' alleged violation of § 1396p(d).

**D.  Count II: Whether a Statute Imposes a Transfer of Assets Penalty for Transfers to a Pooled Special Needs Trust**

enforce it via § 1983 because they "contend that they would benefit from the State's compliance with the provision).

### 1. The Parties' Positions

#### a. MPDT's Position

MPDT argues that MDHHS is violating § 1396p(d) because, the Trust claims, no statute imposes a transfer of assets penalty for transfers to a pooled special needs trust. *Compl.* ¶¶ 3, 21. It asserts that the general anti-transfer rule contained in § 1396p(c) does not apply to the funding of pooled special needs trusts. *Compl.* ¶ 3. Specifically it argues that § 1396p(d)(4)(C) exempts pooled special needs trusts from the reach of § 1396p(c). *Id.* ¶ 2.

MPDT advances the premise that subsection (c) and subsection (d) should be read together as part of an integrated whole because they were enacted simultaneously as part of the Omnibus Budget and Reconciliation Act of 1993. *Pls.' Opp'n* at 2. MPDT elaborated its view of the comprehensiveness and cohesiveness of the legislative scheme at oral argument. MPDT asserts that subsection (d) governs trusts "and transfers to [] trusts." *Id.; Pls.' Opp'n* at 2-3. It also claims that "[t]rusts are covered when referred to by subsection (d), but the terms of subsection (c) do not otherwise reference or apply to trusts." *Id.* at 4. MPDT claims that "Congress intended that . . . [(d)(4) trusts] be funded without penalty." *Id.* at 9. MPDT cites the actions of certain state Medicaid agencies and state courts that it argues support its position. *Id.* at 8-10; *id.* Attachs. 3, 4, 6-12.

MPDT claims that to treat all actions funding trusts as potentially subject to subsection (c) would render subsection (d) redundant and superfluous. *Id.* at 10-11. MPDT asserts that to treat transfers of funds into trusts listed in (d)(4) as subject to

subsection (c) penalties would defy the purpose of the trusts described in (d)(4)(B), suggesting that Congress could not have intended such a result. *Id.* at 11-12. MPDT then argues that because the seven exclusions that immediately precede (c)(2)(B)(iv) cover only transfers to someone else, (c)(2)(B)(iv) should also be read as applying only to third-party transfers—not to trusts created to benefit an individual who created the trust, such as the MPDT. *Id.* at 13-14. MPDT argues that applying the transfer penalties to transfers of assets into pooled special needs trusts creates "odd" and "harsh" results. *Id.* at 14-15. MPDT argues that the Centers for Medicare and Medicaid Services' (CMS) contrary position is entitled to *Skidmore* deference, which allows a court to evaluate the agency's "thoroughness," the "validity of its reasoning," its "consistency," and its "power to persuade, if lacking the power to control." *Id.* at 15-17 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)). MPDT argues that CMS has not sufficiently explained the rationale underlying its position. *Id.* at 16-17. Ultimately, at oral argument, MPDT conceded that the weight of authority runs against its interpretation.

### b. MDHHS' Position

MDHHS takes the position that the Medicaid Act requires it to treat transfers of assets into pooled special needs trusts as it does. *Def.'s Mot.* at 1. Its argument begins with the premise that states choosing to participate in Medicaid, such as Maine, must comply with the requirements of the Medicaid Act. *Id.* at 3. Among those requirements is that the state have a plan that complies with § 1396p. *Id.* (citing 42 U.S.C. § 1396a(a)(18)). It points out that subsection (c) of § 1396p provides

for eligibility penalties for beneficiaries who make certain transfers of assets for less than fair market value, while exempting certain such transfers. *Id.* at 3-4, 6-7; *Def.'s Reply* at 1. MDHHS argues that none of the exceptions applies to deposits into the MPDT by persons over age sixty-four. In support, MDHHS cites the text of the exemption from eligibility penalty for certain transfers to pooled special needs trusts codified at § 1396p(c)(2)(B)(iv):

> An individual shall not be ineligible for medical assistance by reason of paragraph (1) to the extent that the assets were transferred to a trust (including a trust described in subsection (d)(4) of this section) established solely for the benefit of an individual under 65 years of age who is disabled (as defined in section 1382c(a)(3) of this title).

*Def.'s Mot.* at 4. MDHHS calls attention to the age limitation in the subsection and states that its plan and regulations limit application of the exemption only to where the individual is under age sixty-five. *Id.* at 2, 4; *Def.'s Reply* at 1-2. MDHHS says that the statute applies a penalty to transfers to pooled special needs trust only when such trusts are established for persons age sixty-five and older. *Def.'s Mot.* at 2, 7.

MDHHS points out that § 1396p(d) governs the extent to which states are to consider trusts as resources available to Medicaid beneficiaries for purposes of eligibility determinations. *Id.* MDHHS interprets § 1396p(d)(4) as exempting certain trusts from subsection (d), but not from subsection (c). *Id.* In other words, MDHHS argues that (d)(4) exempts the corpus and payments from certain trusts from impacting eligibility determinations but does not exempt deposits into them from the transfer of assets penalties.

MDHHS highlights that CMS agrees with its position, and it cites a CMS bulletin that expresses that view. *Def.'s Mot.* at 7-8; *id.* Attach. 1 *CMS Bulletin* (*CMS Bulletin*). It also states that the Social Security Administration (SSA) reached a similar conclusion. *Id.* at 8-9; *id.* Attach. 3 *SSA Program Operations Manual System SI 01150.121 Exceptions-Transfers to a Trust* (*SSA Manual*). MDHHS cites the Eighth Circuit's congruent holding in *Olson* and the South Dakota Supreme Court's in *Pooled Advocate Trust v. South Dakota Department of Social Services*, 2012 SD 24, ¶ 53, 813 N.W.2d 130 (2012). *Id.* at 9-10.

## 2. Discussion

This is a dispute about the proper interpretation of portions of the Medicaid Act. "Of course, the most reliable guide to the meaning of a statute is the statutory text." *Robb Evans & Associates, LLC v. United States*, 850 F.3d 24, 34 (1st Cir. 2017). Many areas of Medicaid law are labyrinthine rending them "almost unintelligible to the uninitiated." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 648 (2013) (Scalia, J. dissenting) (quoting *Friedman v. Berger*, 547 F.2d 724, 727, n.7 (2d Cir. 1976)). Fortunately, the provisions here are not among them.

"Subsection (d) addresses counting resources for eligibility, whereas subsection (c) addresses punishing sham transactions in which assets are transferred for less than fair market value . . . ." *Sable v. Velez*, 388 Fed. App'x 235, 238 n.4 (3d Cir. 2010). Subsection (c) mandates a penalty period when an applicant "disposes assets for less than fair market value" within a five-year period. *Makepeace v. Dougherty*, No. 10–10266–RWZ, 2010 WL 4180575, at *1 (D. Mass. Oct. 20, 2010); *Pike ex. rel*

*Pike v. Sebelius*, No. CA 13–392S, 2015 WL 4394759, at *7 (D.R.I. Jul. 16, 2015).

Subsection (d) mandates the treatment of trust accounts for purposes of Medicaid

eligibility determinations. *Family Trust of Mass., Inc. v. United States*, 722 F.3d 355,

356-57 (D.C. Cir. 2013). It provides that, in general, the corpus of a trust is to be

counted as an asset of the applicant but exempts certain trusts, including pooled

special needs trusts. *Id.*

     The Court is unconvinced by MPDT's assertion that subsection (c) applies to

trusts only to the extent that subsection (d) refers to subsection (c). Paragraphs

(c)(2)(B)(iii) and (iv) provide exemptions from the normal penalties for transfers into

certain trusts. Thus, MPDT's assertion that subsection (d) is the exclusive provision

governing trusts is without merit. These specifically exempted transfers include: (1)

those to special needs trusts, as defined in (d)(4) *"established solely for the benefit of

an individual under 65 years of age . . . . ."*, 42 U.S.C. § 1396p(c)(2)(B)(iv) (emphasis

supplied), and those to a trust established solely for the benefit of the individual's

child. § 1396p(c)(2)(B)(iii). Neither exempts transfers to pooled special needs trusts

for the benefit of persons over age sixty-four—the transfers at issue in this case.

"Because Congress has enumerated a set of express exceptions, rules of statutory

interpretation instruct that Congress intended to make no other exceptions than

those specified." *Sony BMG Music Entm't v. Tenenbaum*, 660 F.3d 487, 499 (1st Cir.

2011) (internal citations omitted). Hence, all transfers into trusts not covered by one

of those exemptions are captured by the general transfer penalty rules of subsection

(c).

Subsection (d)'s text does not support MPDT's assertion that it governs transfers into trusts. Subsection (d) speaks repeatedly and exclusively to transfers *from* trusts—that is funds *outgoing from* trusts (to beneficiaries)[15]—not to transfers *into* trusts. This corresponds to the implication from the subsection's title— "treatment of trust amounts." It stands to reason that an amount does not become a "trust amount" until it is transferred into the trust. MDHHS penalizes transfers of funds pursuant to subsection (c) when they are transferred—conceptually prior to the completed transfer and deposit into the trust and conversion into "trust amounts."

As MPDT says, "[t]he principal argument for applying a penalty when an elderly person funds a [pooled special needs trust] account is the [language of] subsection (c)(2)(B)(iv)." *Pls.' Opp'n* at 12. It is this argument that carries the day. The text of (c)(2)(B)(iv) explicitly limits its reach to trusts "established solely for the benefit of an individual under 65 years of age." 42 U.S.C. § 1396p(c)(2)(B)(iv). None of the other exemptions to subsection (c)'s penalty provisions applies here. All transfers of assets not covered by an exclusion—including the transfers at issue here—are subject to penalty. "If the plain language of a statute elucidates its meaning, that meaning governs." *Robb Evans*, 850 F.3d at 34.

The Court's interpretation is consistent with those of the Eighth Circuit and the South Dakota Supreme Court on this same question. In *Olson*, the Eighth Circuit examined § 1396p(c)(2)(B)(iv) and rejected an argument by a trust that the provision

---

[15]     *See, e.g.,* 42 U.S.C. § 1396p(d)(3)(A)(ii) ("payments from the trust to or for the benefit of the individual shall be considered income of the individual"); § 1396p(d)(3)(A)(iii) ("any other payments from the trust shall be considered assets . . ."); § 1396p(d)(3)(B)(i) ("if there are any circumstances under which payment from the trust could be made to or for the benefit of the individual . . . ").

does not apply to trusts created by the beneficiary. *Olson*, 676 F.3d at 702. It concluded, "[d]espite the lack of an age limit within paragraph 1396p(d)(4)(C) for purposes of counting resources, Congress intended to exempt transfers of assets into pooled trusts from the transfer penalty rules of subsection 1396p(c)(1) only if the transfers were by those under age 65." *Id*. The South Dakota Supreme Court employed similar reasoning in concluding "that under the unambiguous statutory language, transfers of assets for less than fair market value into pooled trusts by beneficiaries age 65 or older will be subject to a transfer penalty period for Medicaid eligibility purposes." *In re Pooled Advocate Tr. v. South Dakota Dept. of Soc. Servs.*, 2012 S.D. 24, ¶ 38, 813 N.W.2d 130, 142. The court explained that the rules for counting assets for eligibility determinations under subsection (d) and those regarding penalties for asset transfers under subsection (c) are separate and that there is no logical inconsistency in one containing an age limitation for pooled trusts and the other not. *Id.* 2012 S.D. 24, ¶¶ 39-41, 813 N.W.2d at 142-43. The Third Circuit has stated the same basic conclusion in a dictum: "elderly individuals (65 and over) transferring assets into a pooled trust are made ineligible for Medicaid for a period of time." *Lewis*, 685 F.3d at 351.

This interpretation of the statute echoes statements included in state court opinions that MPDT cited. *Pls.' Opp'n* Attach. 10 *Dawn Peittersen v. Minnesota Department of Human Services & Dakota County Social Services*, at 5 (citing § 1396p(c)(1)(A): "transfers of assets to a qualified trust by a person age 65 or greater are generally subject to a transfer penalty for Medicaid eligibility purposes"); *id.*

Attach. 8 *Lee Ann Beinke v. State of Minnesota Department of Human Services, and Blue Earth County Human Services Department*, at 6-7, 9 (citing § 1396p(c)(2)(B)(iv): "While transfers of assets into a pooled trust of this kind are considered exempt transfers for disabled persons generally, Appellant's transfer is not exempt because she is over the age of 64 . . . If Appellant were under the age of 65, her transfer of assets would be exempt").

The Court's interpretation also corresponds to the views of CMS and the Social Security Administration (SSA). The former advised state Medicaid agencies, including MDHHS, that "A pooled trust established by an individual age 65 and older is not exempt from the transfer of assets provisions."[16] *CMS Bulletin* at 1. Similarly, SSA's manual for processing of claims states that the transfer penalty "period of ineligibility does not apply to an individual who transfers a resource to a trust established for the sole benefit of an individual including himself or herself who is under age 65 and is blind or disabled." *SSA Manual* at 1. This age limitation in the exemption mirrors the statutory text.

These agency interpretations are consistent with this Court's separately determined conclusions. Although the parties have argued about whether the agency

---

[16] CMS elaborated on its rationale:

Although a pooled trust may be established for beneficiaries of any age, funds placed in a pooled trust established for an individual age 65 or older may be subject to penalty as a transfer of assets for less than fair market value . . . The statute does provide an exception to imposing a transfer penalty for funds that are placed in a trust established for a disabled individual. However, only trusts established for a disabled individual age 64 or younger are exempt from application of the transfer of assets penalty provisions.

*CMS Bulletin* at 1.

views are entitled to *Skidmore* or *Chevron* deference, s*ee Skidmore v. Swift & Co.*, 323 U.S. 134 (1944); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 2778 (1984), the Court does not resolve that issue because under either doctrine, the result is the same.

Subsection (c) penalizes transfers of assets that it does not exempt.  It exempts transfers to special needs trusts for individuals age sixty-four and younger.  It does not exempt transfers to such trusts for older individuals.  Thus such transfers for individuals over age sixty-four are subject to penalty.

MDHHS is correct that while § 1396p(d)(4)(C) exempts the corpus of, and disbursements from, pooled special needs trusts from being considered assets or income of a beneficiary regardless of her age, § 1396p(c)(2)(B)(iv) exempts transfers to pooled special needs trusts from the transfer penalty only if the beneficiary is under the age of sixty-five.  *See* Joseph Rosenberg, *Supplemental Needs Trusts for People with Disabilities: The Development of a Private Trust in the Public Interest*, 10 B.U. PUB. INT. L. J. 91, 134 (2001) ("a person 65 or older who transfers assets into a pooled trust triggers a penalty period of ineligibility for Medicaid; a transfer of assets into an OBRA '93 disability trust by a person under the age of 65 is exempt from the penalty period").  ""[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States,* 464 U.S. 16, 23 (1983) (internal quotation omitted).  As such, § 1396p(c)(2)(B)(iv) does not immunize transfers of assets into pooled special

needs trusts for beneficiaries age sixty-five and older from subsection (c)'s provisions that penalize transfers of assets for less than market value. The Court concludes that MDHHS's imposition of penalties pursuant to 42 U.S.C. § 1396p(c) for transfers of assets by persons age sixty-five and older into pooled special needs trusts does not violate 42 U.S.C. § 1396p(d). In conclusion, in Count II, MPDT has failed to state a claim upon which relief can be granted. *See* FED. R. CIV. P. 12(b)(6).

## III. CONCLUSION

The Court DISMISSES without prejudice Plaintiff Yvonne Richardson's claims as unripe. The Court DISMISSES Count I without prejudice and the Court GRANTS the Defendant's Motion to Dismiss as to Count II (ECF No. 7).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of February, 2018